RECEIVED

SEP 2 7 2021

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:21-CV-00042-D

Susan W. Vaughan,
Plaintiff

COMPLAINT
FOR DAMAGES

v.

Kathlyn S. Romm, an individual; Ray Matusko,
an individual; Courtney Hull, an individual;
Meader W. Harriss III, an individual; Deputy Clerk Doe,
an individual,
Defendants

JURY TRIAL DEMANDED

_Susan W. Vaughan_
Susan W. Vaughan
1417 19th Street
Greensboro, NC 27405
wellsvaughan@gmail.com
252-305-9992

1

*Lawsuit: A legal action started by a plaintiff against a defendant based on a complaint that the defendant failed to perform a legal duty which resulted in harm to the plaintiff.*

According to the Department of Justice:

> *Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.*
>
> *For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim.*

The Free Dictionary states that:

> *The Supreme Court has ruled that any state law that abridges Freedom of Speech, freedom of religion, **the right to trial by jury**, the Right to Counsel, the right against Self-Incrimination, **the right against unreasonable searches and seizures**, or **the right against cruel and unusual punishments will be invalidated under section 1 of the Fourteenth Amendment**. This holding is called the Incorporation Doctrine. [emphasis added].*

Section 1 of the Fourteenth Amendment to the U.S. Constitution states in part that:

> *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; **nor shall any State deprive any person of life, liberty, or property, without due process of law**; nor deny to any person within its jurisdiction the equal protection of the laws. [emphasis added].*

According to the Legal Information Institute:

> *In addition, the Court has held that the Due Process Clause protects against practices and policies that violate precepts of fundamental*

*fairness,**1078** even if they do not violate specific guarantees of the Bill of Rights.**1079***

Eight Amendment to the U.S. Constitution, applied to the states via the Fourteenth Amendment:

> *Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.*

1. Plaintiff Susan W. Vaughan, grandmother of EJV (herein after, Plaintiff) brings this action pursuant to 42 U.S.C §1983, et. seq., to redress the deprivation of rights secured to her under the United States Constitution, including the Eighth and Fourteenth Amendments to the Constitution, and under federal and state law. Some other of Plaintiff's rights such as the right to trial by jury and the right against cruel and unusual punishments were deprived by certain supposedly unenforceable laws themselves; however, these would not have been used against Plaintiff at all had Defendants complied with those laws that do protect a citizen's constitutional rights. Said deprivations were inflicted upon Plaintiff by Defendants herein, and by each of them, in some manner. Each of the Defendants herein were at all relevant times acting under color of law as either county or state, or both, employees or agents. Defendants Harriss' and Hull's roles include their conspiracy and/or complicity in DSS's commission of fraud and. very likely, fraud upon the court.

2. Plaintiff also brings this action under 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights to redress the conspiratorial nature involving a

stipulation agreement drawn up by DSS Defendant Romm and/or her department employed Attorney, Defendant Hull, and Defendant Harriss's involvement in pressuring Plaintiff to stipulate. Plaintiff alleges that all Defendants, perhaps with the exception of Matusko and his Deputy Clerk, were aware that the terms of the stipulation were based on fraud and trickery and it was presented to Plaintiff with malicious intent to defraud Plaintiff and the court.

3. Based on newly discovered evidence from other victims of this rogue DSS agency and same agency in Dare County, N.C., Plaintiff brings this lawsuit also alleging Monell claims. Plaintiff alleges that the due process violations committed against Plaintiff occur routinely in these counties, due first to a failure to properly train case workers, directors and other agency employees regarding Civil Rights and the laws governing their authority and restrictions on authority regarding child neglect cases. Second, judging from Clerk of Court Matusko's testimony, it is apparent that he as a final policymaker of his office has adopted an unconstitutional policy of not calendaring hearing dates for Petitions for Judicial Review that are not presented on an AOC form. Because the use of this form is clearly not required by statute or due process, this evidence of local practice in violation of due process also supports a Monell Claim. Another support of Monell is the new revelation that apparently either Currituck DSS does not train its agents to do background checks on prospective Foster or Adoptive

4

parents, or else it allows them to negligently place vulnerable children with families where one or more parent suffers serious and dangerous addition problems.

4. Jurisdiction is conferred on this Court by 28 U.S.C §§1343 (a) (3) and 1343 (a) (4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

5. Because the acts and omissions complained of herein occurred in Currituck County, North Carolina, and it is believed that all living defendants currently reside in this or nearby counties, venue is proper in the United States District Court for the Northern District of North Carolina.

## PARTIES

6. At all times relevant to the occurrence of Defendants' violations detailed in this Complaint, Plaintiff Susan W. Vaughan (hereinafter Plaintiff) was a resident of Dare County, North Carolina and was maintaining and living in a family unit as the mother of a disabled adult daughter and grandmother /primary caretaker of her infant son, EJV. For both family members she provided substantial supporting care. Based on N.C. statute definitions in effect at the time, Plaintiff was defined as the legal caretaker and custodian of EJV at the time DSS removed him from his family and his home.

5

7. Plaintiff is informed and believes, and thereon alleges, that, at all times relevant to the occurrence of Defendants' violations detailed in this Complaint, Kathlyn Romm is and was an individual residing in Currituck County, N.C. and employed as Director of Currituck County Department of Social Services. Based on the evidence and Petition filed by Romm's department in September 2013, on record, Romm either authorized or was aware of the drafting of a Petition accusing Plaintiff of seriously neglecting her grandson, without ever providing to Plaintiff or the Court any legitimate evidence to support such an allegation, which is a violation of State Statutes and Plaintiff's civil rights. She then failed to comply with another entire set of State Statutes under NCGS 7B 320-323 (Section 3A), a failure to comply with laws in a way that again violated Plaintiff's due process rights.

8. New discovery, provided by Defendant Matusko's sworn testimony, in his response to Plaintiff's earlier interrogatories, shows that Romm, either directly or through her agent Defendant Hull, or another agent, reported to Clerk of Court Matusko's Deputy Clerk (Defendant Doe) in October, 2013, that she had dropped the charge of serious neglect. Plaintiff, however, was not informed of this decision, nor was it recorded in the case file.

9. Defendant Hull, representing DSS, about 50 days later, used the threat of that dropped allegation to coerce Plaintiff into stipulating to a lesser charge, which both Romm and Hull subsequently used to accuse Plaintiff of being too unfit to have custody of or to adopt her own grandson. Plaintiff was also

6

denied the legally mandated kin placement of EJV with Plaintiff during the remainder of the hearings. Plaintiff was not allowed to respond to more absurd, unsubstantiated allegations DSS agents leveled against her during hearing and in reports (one alleging, under oath, that Plaintiff, who is a former graduate student at UNC School of Public Health, "does not believe in modern medicine." Another alleging that Plaintiff's favorable psychological evaluation was "superficial" because DSS agents were not given the opportunity to negatively influence the licensed therapist who conducted the evaluation beforehand).

10. Plaintiff's right to due process again, even as she remained the official, named "respondent" in the case, was violated because DSS, with the colluding assistance of Plaintiff's "public defender" removed Plaintiff's party status, soon after the agency obtained the fraudulently procured stipulation.

11. Plaintiff is informed and believes, and thereon alleges that, at all times relevant to the occurrence of Defendants' violations detailed herein, Ray Matusko was/is an individual residing in or near Currituck County, N.C. and was/is employed by the State of North Carolina and sworn to uphold the laws and constitutions of the State of North Carolina and the United States. It is part of Defendant Matusko's ministerial job responsibilities to comply with NCGS 7B-323 (b), which states that "upon a petitioner's filing" of a Petition for Judicial Review, he is to calendar a hearing date "...for hearing

7

within 45 days from the date the petition is filed" and "send notice of the hearing to the petitioner and to the director who determined the abuse or serious neglect and identified the individual as a responsible individual."

12. Matusko, by his own admission, did not himself calendar a hearing date for Plaintiff's timely-filed Petition for Judicial Review, nor did he ensure that his Juvenal Deputy Clerk (Defendant Doe) did so. Matusko's sworn testimony acknowledges that his office did in fact receive and file/clock said Petition, the original of which this Court will find on the official state district one court record and a copy as exhibit with Federal case 2:16-CV-61-Fl. Matusko explains that the Petition Plaintiff filed was not presented on a form provided by the Administrative Office of the Courts and that his Deputy Clerk called DSS to see if a hearing was needed. Plaintiff notes that this call was completely unnecessary and in no way authorized by the state statutes and no way in line with due process.

13. Matusko's testimony then explains that the Deputy Clerk was told by "DSS" that it would not go forward with pursuing Plaintiff's inclusion on the Responsible Individual's List, and so a hearing date was never set. Plaintiff asserts that examination of state statue regarding this responsibility of the Clerk of Court shows that neither the clerk nor anyone in his office is authorized to simply accept a verbal response from DSS as justification for not calendaring a hearing date for a properly filed Petition for Judicial Review.

8

14. The most important issues here are that Plaintiff did not discover why she was never informed of a hearing date for her Petition, until October, 2018 (five years after this violation occurred), when she received her copy of Matusko's responses to her interrogatories. The charge of serious neglect, according to Matusko's response, was dropped in early October, 2013. DSS, however, never informed Plaintiff of this crucial information, and Plaintiff alleges this information was withheld from her for malicious reasons that caused Plaintiff serious injury.

15. Plaintiff is informed and believes, and thereon alleges, that, at all times relevant to the occurrence of Defendants' violations detailed herein, Attorney Courtney Hull was employed by Currituck County Department of Social Services [1] and was therefore employed by a government agent in the same capacity as Attorney Scott Lindsay, who was working for Cherokee County Department of Social Services as their employer who handled all the litigation and who promoted a practice of coercing parents to sign a document that resulted in them losing all rights to their child. Lindsay has been held partly responsible for this form of fraud and civil rights violation that is comparable to the same civil rights violations committed in Plaintiff's case, as the result of a federal civil rights lawsuit against him.

1. Footnote: Hull's bio on her website states: "She began doing social services work in 2007 when she began representing Currituck County Department of Social Services. She handles all aspects of social services litigation including child protective services, adult protective services, guardianship, and appellate matters."

16. Similar to Lindsay's unconstitutional actions in Cherokee County, N.C.[2], Attorney Hull specifically drafted and presented to Plaintiff a stipulation, the purpose of which was to eliminate any requirement of DSS to present evidence to the Court to support their fraudulent allegations; i.e. the stipulation eliminated the trial on whether or not the allegations amounted to neglect and whether or not DSS could substantiate them with evidence. This particular stipulation, drafted by Hull and presented to Plaintiff in late November, 2013 was one that Hull, as representative and predominant spokesperson for Currituck DSS, had to have known was based on fraud because it failed to disclose to Plaintiff or the Court that the charge of "serious neglect" had been dropped. Said stipulation specifically used that (unbeknownst to Plaintiff) dropped charge as a threat to coerce Plaintiff into agreeing to a lesser charge. Said stipulation and Defendant Harriss made it clear that Plaintiff's failure to stipulate would result in her being faced with inclusion on the Responsible Individuals List and CRIMINAL PROSECUTION. Plaintiff of course knew those consequences would completely end any hope of her regaining custody of her grandson, EJV.

16. Plaintiff believes and therefore alleges that she can establish upon discovery and interrogatories of other Defendants, that Courtney Hull was

2. Footnote: "The CVA is the product of both actual and constructive fraud on behalf of the Cherokee County Department of Social Services, its agents and employees Attorney Scott Lindsay and Director Cindy Palmer," a judge's decree said in 2018." (see: https://carolinapublicpress.org/45565/verdict-federal-jury-awards-millions-to-daughter-father-separated-by-cherokee-county-dss/)

the very one who relayed Defendant Romm's alleged message to Matusko's

Deputy Clerk, which would prove she had full knowledge that the charge of

serious neglect had been dropped long before she drafted and offered

Plaintiff a stipulation that fraudulently represented that charge as active

and a real threat to Plaintiff's liberty interests.

17. Further evidence that this whole plan was a malicious plot DSS devised

to avoid having to provide evidence of its fabricated allegations and Hull's

knowing and willing participation in this conspiracy is the fact that, per

Harriss's communication with Plaintiff, Hull had complained earlier to

Harriss about Plaintiff her Petition for Judicial Review.  Harriss's emails

substantiating this conversation are on record with the State of North

Carolina's Indigent Defense Service (IDS).

18. Plaintiff is informed and believes, and thereon alleges, that, at all times

relevant to the occurrence of Defendants' violations detailed in herein,

Attorney Meader W. Harriss, III was and remains a resident of Chowan

County and was employed by the State of North Carolina as an Indigent

Defense Services attorney. Based, among other evidence, on the false and

coercive nature of Harriss's email communication (on federal court record)

related to the stipulation drawn up by Defendant Hull, plaintiff has reason

to believe that Harriss was a party to the conspiracy to deceive Plaintiff into

stipulating, which would not only relieve DSS from having to provide

evidence for any of their false allegations and fabricated evidence against

11

Plaintiff, but it would and relieve Harriss of having to do his job to "zealously" defend Plaintiff, which he clearly failed to do in the first place.

19. Plaintiff asserts that Harriss not only knew Plaintiff was in the process of filing her Petition for Judicial Review at the time he was appointed as her counsel, he approved of her taking that action at the time; however, he never followed up as to why Plaintiff was not provided a hearing date, and it is now evident to Plaintiff, after learning of Matusko's testimony, that Harriss had to have known DSS had dropped the charge of serious neglect or else a hearing would have taken place before the stipulation was offered.

20. Furthermore, Harriss, soon after the Petition was filed by Plaintiff, passed on to Plaintiff what he stated was Hull's complaint to him about the filing. Harriss, himself, chastised Plaintiff for filing the Petition he had previously told her to go ahead with. This communication is on record. Given Matusko's 2018 admission that he never calendared a hearing date because his Deputy Clerk was told by "DSS" that the charge was dropped, there is no excuse, other than Harriss' decision to collude with DSS in violating Plaintiff's rights, for him to fail to pursue why Plaintiff did not get her rightful hearing, and to then side with DSS in coercing Plaintiff to stipulate in order to "avoid" a charge that Plaintiff at the time had no idea had already been dropped.

21. The fact that Harriss was soon rewarded with an uncontested judgeship is grounds for investigation of his true motive in pressing Plaintiff to

12

stipulate to something Plaintiff clearly informed him was NOT true, including even lying to Plaintiff about the conditions of the stipulation and not even providing Plaintiff with the actual complete written form of said stipulation before pressuring her to sign it, a day before adjudication was scheduled - the hearing where DSS would have to come up with some evidence to support the lies it could not support. It was clearly a setup in which all Defendants participated, and DSS was running the show.

22. Plaintiff has reason to believe and thereon alleges, that, at all times relevant to the occurrence of Defendants' violations detailed herein, Clerk of Court Matusko's Deputy Clerk resided in or near Currituck County, North Carolina. Plaintiff has reason to believe that as an agent of the State of North Carolina, Defendant Deputy Clerk Doe, failed in her duty to calendar a hearing date for Plaintiff's Petition for Judicial Review and then failed to inform Plaintiff of her noncompliance with section 3A of NCGS 7B. Plaintiff further testifies in this verified Complaint herein, that she called Ray Matusko's office recently (August, 2021), requesting the name of the Juvenile Deputy Clerk he refers to in his interrogatory responses dated September 28, 2018. Matusko relayed a message back to plaintiff via a staff member that he refused to name that person. Plaintiff was trying to find out exactly who, employed by Currituck "DSS" informed that unnamed clerk that it had decided not to pursue the RIL allegation. Plaintiff is clearly entitled to this information. Matusko's alleged response indicates further

13

evidence of his involvement in the county's conspiracy to deny Plaintiff of her rights and his responsibility toward compensation due to Plaintiff.

COMPLAINT FOR DAMAGES: GENERAL ALLEGATIONS

23. This lawsuit is based predominantly on the facts and evidence provided by the sworn (9/28/2018) testimony of Defendant Ray Matusko, discovered for the first time by Plaintiff when she received her copy of said document [Matusko's response to Plaintiff's interrogatories. on October 1, 2018 (filed under Case No. 2:16-CV-61-FL, exhibit 55, 11/29/2018)]. Another relevant new discovery is Plaintiff's recently acquired knowledge of the adoptive father's long record of reckless driving across several states, driving under the influence and driving without a license, discovered by Plaintiff in June, 2020 after a news report documented him nearly running down a group of pedestrians with his vehicle, hitting a tree instead, then subsequently running from police and flipping his vehicle, rendering himself unconscious.

24. This repeatedly reckless individual, Ralph Clayton Barlow, was one with whom Plaintiff's grandson was placed immediately after Dare County unlawfully removed him from his biological family and Plaintiff's custody, thus putting EJV in harm's way. Adoption by this same man, Defendants Romm and Hull insisted to the Court, was in EJV's best interest after DSS agents and their accomplices fraudulently accused Plaintiff of seriously

14

neglecting EJV, then coerced her, using a dropped charge as a threat, into stipulating to a lesser form of neglect.

23. Using that stipulation as if it were legitimate "evidence" that Plaintiff was neglectful, Defendants Romm and Hull accused Plaintiff of being too unfit to adopt her own grandson, who had never suffered any harm or illness while in Plaintiff's care and custody. The record clearly supports the fact that there was never any harm or injury or neglect (according to NCGS 7B definition and NCDHHS Screening Tools) to EJV while he was living with his biological family.

24. The Petitions filed alleging EJV was neglected were filled with fabricated, distorted and irrelevant allegations – such as Plaintiff "is adamantly opposed to vaccines," an unscrupulous distortion of Plaintiff's agreement with EJV's pediatrician to an altered vaccine schedule, and one without exposure to mercury, which EJV's mother requested. Another allegation denigrated Plaintiff for agreeing with several brain injury experts and disagreeing with DSS agents regarding Plaintiff's adult daughter's diagnosis after she suffered a severe maxillofacial injury. Another false allegation was that Plaintiff would not have taken EJV to a pediatrician if DSS had not gotten involved. Even though the fact that not taking a child to a well visit is not considered neglect by the NC DHHS or statute definition, making the allegation irrelevant, the allegation is also false and fraudulent because the agent that alleged that falsehood knew Plaintiff and her

15

daughter had made contact and appointments with the pediatrician prior to the agent's involvement.

25. None of the first allegations had anything to do with child neglect. Only the fabricated allegation added by Currituck agents--failure to provide "remedial care" to EJV--would amount to neglect if it were not an outright and absurd lie. EJV had never been sick or injured while in Plaintiff's care and custody. There was no need for remedial care – nothing to remedy. Cross examination of the agent who published that lie in her petition revealed that she didn't even know what "remedial" means.

26. Rather than checking (or else checking and ignoring the associated danger of) the background of the parent DSS allowed to adopt EJV, Romm put EJV in harms' way, supporting this man and his wife as preferred adoptive parents, as if that was in EJV's best interest over his biological family that posed no such risk - ie neither Plaintiff nor his mother had any history of substance abuse or addition or reckless driving. EJV's mother was stigmatized and deprived of her only child because she suffered a serious head injury and related symptoms. Plaintiff was attacked by DSS for trying to help her daughter get treatment for that traumatic brain injury rather than forcing her into an inappropriate mental health facility. Plaintiff had set up an appointment for her daughter with the former President of the Brain Injury Association of America. Yet Defendants Romm and Hull alleged

16

in court records seeking to dismiss Plaintiff's petition for Adoption of EJV that Plaintiff had not even "advocated" for treatment for EJV's mother.

27. Documented testimony by Defendant Matusko, provides substantial evidence that after Defendant Romm authorized the filing of a petition that contained fabricated evidence against Plaintiff, seeking her department's custody of Plaintiff's grandson, Romm repeatedly violated the law and Plaintiff's right to due process, including committing fraud against Plaintiff and the Court. After first, violating Plaintiff's Civil Rights with false allegations, Romm then failed to comply with state statutes under NC GS 7B (320 through 323) ie failing perform her legal duty to provide Plaintiff with any alleged evidence supporting her allegations, failing to provide Plaintiff proper notification of Plaintiff's right to file for Judicial Review and the consequences if Plaintiff failed to do so.

28. Despite Romm's failure to comply with the law, Plaintiff read the law and properly and timely filed with the Clerk of Superior Court her Petition for Judicial Review, a document which complies with the requirements stated in the statutes and refutes all the claims of neglect made against Plaintiff by Romm and her Department. Defendant Matusko's testimony confirms that Plaintiff timely filed said Petition.

29. This set of state statutes, NCGS 7B, Section 3A, were added in 2010 to specifically address previous constitutional rights violations regarding placement on the Responsible Individuals List (RIL). They required that

17

Defendant Matusko (upon filing of the petition) calendar a hearing date for that Petition. Defendant Matusko's testimony clearly proves that Matusko never performed his legal duty regarding this petition. Although Matusko provides an explanation for his failure to ensure Plaintiff's due process rights in this matter, the explanation, nevertheless, does not relieve him of that duty, which he did not perform, which resulted in grave consequences to Plaintiff, her daughter and her grandson.

30. Defendant Matusko's failure to perform his legal duty created a gap in the procedural due process regarding issues where a Plaintiff is accused of not just simple child neglect, but "serious child neglect," which accelerates the allegation of neglect into one that can be criminally prosecuted. In other words, the civil child neglect case becomes more of a criminal case, which puts one so accused in serious danger of loss of liberty, loss of rights, stigmatization and defamation, as well as loss of contact with her own kin. This accounts for the added statutes to ensure constitutional due process, because of the gravity of the consequences if the petitioner if found guilty as accused.

32. According to N.C. statutes relevant to Plaintiff's complaint, once a clerk of court sets a calendar date for a timely-filed Petition for Judicial Review, he or she is then required by law to inform both the director of the social services department that made the allegation of serious neglect and the accused/petitioner of the set hearing date. The law then requires the

Director (in this case Romm) to review her evidence and decide whether to drop or go forward with the allegation, and she/he is to inform, in writing both the Clerk of Court and the Petitioner/accused of her decision.

33. According to Defendant Matusko's sworn testimony, he turned his duty to calendar a hearing date over to his Deputy Clerk, whose name he failed and still refuses to disclose to Plaintiff. This deputy clerk allegedly told him that "...DSS was not going to go forward on the allegation to place the plaintiff on the Responsible Individual's List so they did not give her the Form AOC-J-131."

34. Matusko's testimony attempts to imply that his/his deputy clerk's duty to calendar a hearing date or their calling DSS to ask if they should, was justified by the fact that Plaintiff filed her Petition without using the AOC form.  However, this excuse doesn't fly. According to the NC Administrative Office of the Courts, most of the forms they provide are for convenience and are not required to be used for filing, unless the statute specifically requires use of the form.  Although Section 3A does require, among other mandates, that the DSS director provide the accused the form for filing a petition for judicial review, Plaintiff never received that form or ANY information regarding the allegation of serious neglect other than a box checked on the petition designating Plaintiff as a "responsible individual." The statute containing the requirements for filing a Petition for Judicial Review (§ 7B-323 (a), does not require the Petitioner use any AOC form.

19

35. According to N.C. statute, an allegation of serious neglect or abuse of a child, if not successfully challenged or dropped, will result in the accused being placed on a List, an RIL —a register that not only stigmatizes and defames that person, but also prevents them from working with children, adopting or having custody of a child. In its opinion in re W.B.M., the N.C. Court of Appeals found that placing an individual on the RIL caused such a serious infringement of constitutional rights that the legislature added the legal duties outlined in NCGS 7B - 320-323, with which both Romm and Matusko failed to comply, to the juvenile code.

36. Of particular note is that Romm had her attorneys respond, on her behalf, to her interrogatories in which she falsely alleges compliance with all laws, without her signing the responses or swearing to their accuracy – and without providing any evidence to support her statements. She did not comply with any of section 320 or even with the requirements for filing a petition in the first place, because Plaintiff violated no laws, no policies, and did nothing whatsoever that meets the definition of any child neglect, much less serious neglect, nor can Romm prove otherwise or apparently even swear to the truth of her responses.

37. When Romm dropped, according to Matusko's sworn testimony, the charge of serious neglect she had alleged against Plaintiff, she was required BY STATUTE to inform Plaintiff and the Clerk of Court of this decision in writing; however, she did not (see NCGS 7B-320-323, effective in 2013 in

the case docket for #2:16-CV-61-FL) She let plaintiff believe for at least another 48 days that Plaintiff was in danger of being included on a derogatory and rights-limiting Responsible Individuals List (RIL) and also in danger of criminal prosecution, with no chance of having EJV returned to her custody or even placed with her under DSS supervision.

38. Then, most egregiously, Romm, through her spokesperson/ representative, Defendant Hull, over a month AFTER SHE DROPPED THE SERIOUS NEGLECT CHARGE, (November, 2013) used coercive tactics, including fraud, to trick Plaintiff into signing a stipulation with the promise of dropping the serious neglect charge if she did. (This promise is documented in email communication between Plaintiff and Defendant Harriss).

39. Also, because Hull very likely was the one who conveyed the alleged message about DSS dropping the charge to the Clerk of Court's office, Plaintiff believes further interrogatories to question either Matusko or his Deputy Clerk or both, should provide the answer to the question of whom from "DSS" relayed the message that the charge of serious neglect had been dropped (in early October 2013). Plaintiff also requests that Matusko identify the Deputy Clerk he refers to in his testimony, by name. Whether or not Hull was the one who relayed that message, Plaintiff believes that Hull had knowledge of that communication and knowledge that she was

intentionally committing fraud when she later included dropping the charge as a condition of her/DSS' stipulation.

40.  The federal lawsuit held in earlier this year in western N.C. provides a precedent of intolerance by the courts for the kind of shenanigans and fraud that was committed in Plaintiff's case and precedent for a civil rights lawsuit against a DSS attorney. Although the details of fraud committed in that and the case herein differ, there is enough similarity of tactics used by both to conclude that Currituck DSS and Attorney Hull made use of a fraudulent stipulation in the same way that Attorney Scott Lindsay and Director Cindy Palmer used the CVA to threaten and coerce trusting parents and other kin to, in effect, give up their right to association and custody of their child or grandchild.

41. Although Currituck County DSS and its agents did not in Plaintiff's case, use CVA's, they did in fact use a fraudulent stipulation to keep EJV in DSS custody and adopt him to a non-biological couple

42. In addition to Romm's commission of fraud and violations of numerous laws enacted to protect constitutional rights, her attorney and the entire department, including former defendants Samantha Hurd and Kristen Harris,  there is clear evidence of a conspiracy which includes Plaintiff's late-appointed counsel, Meader Harriss, who, after knowing Plaintiff was in the process of filing her Petition for Judicial Review at the time he was appointed by the court, never followed up to ensure that Plaintiff got the

22

hearing she deserved; nor did he inform her that the charge of serious neglect had been dropped. Instead, he not only played along with DSS' coercive tactics to get a very convenient stipulation on their part - he did so aggressively and fraudulently, as Plaintiff's email communication with Defendant Harriss clearly substantiates. Therefore Plaintiff alleges that Harris conspired with government officials to deprive Plaintiff of her rights and is therefore subject to lawsuit under color of law and paying damages for injuries suffered by Plaintiff.

43. The final ruling in Plaintiff's initial federal lawsuit, filed before she became aware of either Matusko's testimony or the adoptive father's reckless and criminal background, opined (referencing *Riccio*) that the state laws that Matusko and Romm violated [7B – 320 (b) - 7B-323] provide more protection than that provided by federal Constitutional rights. This makes no sense at all. Violation of due process is violation of due process, which is a state and federal constitutional right that includes the right to a meaningful opportunity to be heard and know the basis of the accusations before the State deprives one of a liberty interest.

44. Comparison of the statutes NCGS 7B-320-323 with Constitutional elements of Due Process protections show that the majority of the requirements of these statutes, do NOT, in fact, "grant any more procedural rights than the Constitution would otherwise require," especially

considering the gravity and criminal aspect of the charge of serious child neglect.

44. Plaintiff points to the reason these statutes were enacted [In re W.B.M.], ie, in order to correct Constitutional violations existing in statutory procedure prior to 2010 and also a comparison of these state statutes to a list presented by Judge Henry J. Friendly in his lecture delivered to the University of Pennsylvania Law School in 1975. Friendly describes the list below as:

> ".. enumerating factors that have been considered to be elements of a fair hearing, roughly in order of priority..."

Friendly's list of the elements of a fair hearing are:

- *An unbiased tribunal*
- *Notice of the Proposed Action and the Grounds Asserted for It*

    *It is likewise fundamental that notice be given and that it be timely and clearly inform the individual of the proposedaction and the grounds for it. Otherwise the individual likely would be unable to marshal evidence and prepare his case so as to benefit from any hearing that was provided.*

- *An Opportunity to Present Reasons Why the Proposed Action Should Not Be Taken*
- *The Rights to Call Witnesses, To Know the Evidence Against One, and To Have Decision Based Only on the Evidence Presented*
- *Counsel*
- *The Making of a Record and a Statement of Reasons*

45. A reading of NCGS 7B-320-323 shows that these statutes are all about due process and grant what the Constitutional Due Process Clause requires. The problem is not the statutes. The problem is that actors in Child neglect cases routinely ignore them because they are rarely held accountable when they don't comply.

46. Another reason the NCGS 320 section was added to 7B was because when the charges against a respondent in a child custody case are elevated from simple neglect to serious neglect or abuse, the consequences the respondent faces elevate from civil to criminal. That is why the normally mandated hearing procedure – which by the way the juvenile courts/judges in N.C. District 1 don't comply with anyway – do not provide sufficient due process protections for one accused of a criminal offence with the consequence of not only depriving a family member of association with a beloved child, but also depriving that accused of working with or adopting children, along with facing criminal penalty, including further deprivation of liberty.

47. Therefore, the NC Laws that Mutusko and Romm violated under 7B 320-323 did not exceed Constitutional Due Process protections, and these Defendants' violations were directly responsible for the deprivation of liberty, property and other rights Plaintiff suffered and continues to suffer.

48. While some parts of 7B-320, relating to Defendant Romm's statutory responsibility, may possibly go beyond basic requirements such as Sections (c); nevertheless, 1 and 2 of 7B–320 certainly do not. They require that the Director provide notice and statement summarizing the grounds for the Director's determination of serious neglect or abuse, which are basic Due Process Clause protections that are precisely included in the list above. However, Romm complied with NONE of the sections. Had she done only what Constitutional Due Process requires, that would have been sufficient. But again, **she did nothing** and then she allegedly, unless Matusko or his assistant are lying, dropped the charge, and never einfordm Plaintiff of this decision —nor did Matusko, both of whom owed Plaintiff that information.

49. Most certainly, had Plaintiff been informed that the charge of serious neglect had been dropped in October, 2013, Romm and her cohorts could not have used the threat of that charge's consequences, including criminal prosecution, a month and a half after the charge was dropped, to coerce Plaintiff into stipulating to the false allegation that her grandson had been simply neglected!

50. Without that stipulation, DSS would have had to prove, via adjudication, that EJV had been neglected, without having any evidence that supports such a conclusion or legal definition.

51. Had DSS not coerced Plaintiff via fraud, into stipulating, DSS could not have prevailed in proving its allegations, and thus DSS would have been charged court costs and lost the funds from Social Security they have apparently fraudulently acquired when they placed Plaintiff's vulnerable grandson with strangers, one with a long criminal history.

52. After DSS seized him, EJV would not even drink his bottle for some time; he lost weight, and it was within about two months of his placement in foster care that he was hospitalized with pneumonia. None of these health risks existed while EJV was in Plaintiff's care and custody.

53. Of course, had Matusko calendared Plaintiff for hearing on Romm's proposed action, 3, 4, 5, and 6 on Friendly's list would have been fulfilled, and this nightmare for Plaintiff and her daughter and grandson would have ended in 2013, because Romm did not have any evidence to support the only allegation on the petition that amounts to child neglect – failing to provide "remedial care" to a child who had never been sick or harmed while in Planitiff's care and custody.

53. Case 2:16-CV-61-FL Order's reference to *Riccio* (Order p. 32) is further flawed because *Riccio* is about a police department that violated agency and state **regulations** – not statutes that were specifically enacted to protect Constitutional rights and liberties, as in Plaintiff's case, her reputation and right to retain custody of and adopt her grandson.

53. For said Order [p. 31 bottom] to characterize such Constitutionally protective statutes (NCGS 7B-320-323) as merely "state regulations," is beyond misleading and unfair. Plaintiff should have been allowed trial by jury to rule on the real evidence in her case. The violation of that right to trial by a jury of one's peers, based on a misleading case interpretation, amounts to yet another assault on Plaintiff's right to Due Process.

54. Aside from the fact that Meader Harriss's representation of Plaintiff provides a good picture of how a Nazi would have represented a German of Jewish descent, his role, in addition to being grossly ineffective, was conspiratorial. He took no time to learn about the case; he filed no motion whatsoever on Plaintiff's behalf; he lied to Plaintiff about the stipulation; he tricked plaintiff into not testifying regarding DSS motion to remove her as a party, knowing that Plaintiff remained the respondent to the petition allegations, while banned from saying another word in her defense!

55. The new evidence provided by Matusko's testimony makes it clear that Harriss had to have known he was colluding with DSS to pressure Plaintiff to agree to DSS terms, insisting she would be prosecuted for serious child neglect if she failed to stipulate as DSS demanded, while he knew or else had a responsibility to have known that the denial of a hearing on that matter, itself, voided the threat.

56. Defendant Matusko could not reasonably claim that he was unaware of his duty to calendar a hearing date, upon receipt of Plaintiff's Petition for Judicial Review, because his interrogatory responses (in document previously noted) show that he had routinely done so in the past. The reason he gives for not setting a hearing date for Plaintiff's Review is that "DSS" told his "Juvenile Deputy Clerk that DSS was not going to go forward on the allegation to place the plaintiff on the Responsible Individual's List so they did not give her the Form AOC-J-131." Yet there is nothng in the statute that relieves him of his duty to calendar a date for a properly filed Petition for Judicial Review - nothing.

57. Matusko's document also IMPLIES that his Juvenile Deputy Clerk had to call DSS to ask about his legal obligation to calendar a date, simply because Plaintiff did not use the AOC-J-131 form (which Plaintiff did not receive because Romm broke the law) to file her Petition. This is an absurd argument for a Clerk of Court to try to pass as an excuse for not doing his legal duty - particularly one so crucial to protecting Plaintiff's right to due process and with the life of her only grandson at stake! The statute clearly does not require that the Petition be presented on the AOC form.

58. Section 3A of NCGS 7B, in relevant part is pasted below to make this issue perfectly clear, supporting Plaintiff's argument that the statutes do not require that an accused file her/his petition on an AOC form. It does,

instead, provide the actual requirements, which Plaintiff complied with as required. This section reveals the seriousness of Romm's failure to comply with the same Juvenile Code she cherry-picked to condemn Plaintiff, while ignoring the statutes that restricted her ability to do so without due process!

59. Article 3A.

Judicial Review; Responsible Individuals List.

§ 7B-320. Notification to individual determined to be a responsible individual.

(a) After the completion of an investigative assessment response that results in a determination of abuse or serious neglect and the identification of a responsible individual, thedirector shall personally deliver written notice of the determination to the identified individual in an expeditious manner.

(b) If personal written notice is not made within 15 days of the determination and the director has made diligent efforts to locate the identified individual, the director shall send the notice to the individual by registered or certified mail, return receipt requested, and addressed to the individual at the individual's last known address.

(c) The notice shall include all of the following:

(1) A statement informing the individual of the nature of the investigative assessment response and whether the director determined abuse or serious neglect or both.

(1a) A statement that the individual has been identified as a responsible individual.

(2) A statement summarizing the substantial evidence supporting the director's determination without identifying the reporter or collateral contacts.

(3) A statement informing the individual **that unless the individual petitions for judicial review, the individual's name will be placed on the responsible individuals list as provided in G.S. 7B-311,** and that the Department of Health and Human Services may provide information

30

*from this list to child caring institutions, child placing agencies, group home facilities, and other providers of foster care, child care, or adoption services that need to **determine the fitness of individuals to care for or adopt children**. [emphasis added]*

*(4) A clear description of the actions the individual must take to seek judicial review of the director's determination.*

*(d) In addition to the notice, the director shall provide the individual with a copy of a petition for judicial review form.*

*§ 7B-323. Petition for judicial review; district court.*

*(a) Within 15 days of the receipt of notice of the director's determination under G.S. 7B-320(a) or (b), an individual may file a petition for judicial review with the district court of the county in which the abuse or serious neglect report arose. **The request shall be by a petition for judicial review filed with the appropriate clerk of court's office with a copy delivered in person or by certified mail, return receipt requested, to the director who determined the abuse or serious neglect and identified the individual as a responsible individual. The petition for judicial review shall contain the name, date of birth, and address of the individual seeking judicial review, the name of the juvenile who was the subject of the determination of abuse or serious neglect, and facts that invoke the jurisdiction of the court. Failure to timely file a petition for judicial review constitutes a waiver of the individual's right to a district court hearing and to contest the placement of the individual's name on the responsible individuals list**. [emphasis added].*

*(a1) If the director cannot show that the individual has received actual notice, the director shall not place the individual on the responsible individuals list until an ex parte hearing is held at which a district court judge determines that the director made diligent efforts to find the individual. A finding that the individual is evading service is relevant to the determination that the director made diligent efforts.*

*(b) The clerk of court shall maintain a separate docket for judicial review actions. **Upon the filing of a petition for judicial review, the clerk shall calendar the matter for hearing within 45 days from the date the petition is filed at a session of district court hearing juvenile matters or, if there is no such session, at the next session of juvenile court**. The clerk shall send notice of the hearing to the petitioner and to the director who determined the abuse or serious neglect and identified the individual as a responsible individual. [emphasis added].*

31

> *(b1) Upon receipt of a notice of hearing for judicial review, the director who identified the individual as a responsible individual shall review all records, reports, and other information gathered during the investigative assessment response. If after a review, the director determines that there is not sufficient evidence to support a determination that the individual abused or seriously neglected the juvenile and is a responsible individual, the director **shall prepare a written statement of the director's determination and either deliver the statement personally to the individual seeking judicial review or send the statement by first-class mail. The director shall also give written notice of the director's determination to the clerk to be placed in the court file**, and the judicial review hearing shall be cancelled with notice of the cancellation given by the clerk to the petitioner [emphasis added].*

60. The very fact that Romm did not provide Plaintiff with said form (AOC-J-131) presents further proof that she, through her attorney, lied to Plaintiff and to a U.S. Federal Court about complying with all statutes, and she lied about notifying Plaintiff as the law requires when there is a threat of being placed on the RIL and what Plaintiff could do to protect her rights in the matter. Furthermore, she obviously did not provide either the clerk or Plaintiff written notice of her determination to drop the serious neglect charge, unless that information was, in fact, placed in the court file and Judge Reid, DSS agents, Courtney Hull and Meader Harriss ignored it, because the facts show that they continued on with the hearings as if Plaintiff had seriously neglected her grandson and used that dropped charge to coerce Plaintiff into stipulating, as if the charge was still in effect

32

## CONCLUSION

61. The previous ruling on DSS crimes committed against Plaintiff, which cites *Riccio* as support for the argument that Section 3A of NCGS 7B provided more rights protections than what the U.S. Constitution allows, is ultimately irrelevant to the most egregious violation regarding this lawsuit based on new discovery. Romm did NOT have to go forward with the serious neglect charge, but she DID have to inform plaintiff that she dropped it, and that decision DID have to be in writing and filed with the case file so that it was on record.

62. To not only NOT inform Plaintiff that the charge was dropped and then use it to threaten her to stipulate to a lesser charge cannot possibly NOT be a violation of a person's constitutional rights. And Defendants could not possibly have NOT known that it was wrong and a violation of Plaintiff's constitutional rights to withhold that information from Plaintiff and then threatem her with a dropped charge to procure a stipulation. Then to use that stipulation as an excuse to deny Plaintiff's right to adopt her only grandson and block his mother from seeing or having any contact with her only son is beyond cruel and unusual punishment, especially for someone who committed no crime or harm to anyone.

63. Plaintiff is the only party to this case that did not break or violate ANY laws, and yet Plaintiff is the only one being punished, and that punishment

alone, is a violation of the U.S. Constitution's Eighth Amendment protection against cruel and unusual punishment, applied to the states via the Fourteenth Amendment. Plaintiff is not only blocked from seeing or speaking to her grandson, she is left now to wonder whether or not he will be killed or disabled by DSS's negligent adoption of him to a reckless, criminal driver and person plagued with serious addiction problems

64. *Found in Wikipedia, regarding cruel and unusual punishment:*

> *"... in the words of Trop v. Dulles, 356 U.S. 86 (1958), at page 101, "the evolving standards of decency that mark the progress of a maturing society." Punishments including capital punishment must therefore not be "excessive". The "excessiveness" of a punishment can be measured by two different aspects, which are independent of each other. The first aspect is whether the punishment involves the unnecessary and wanton infliction of pain. The second aspect is that the punishment must not be grossly out of proportion to the severity of the crime. In Furman v. Georgia, 408 U.S. 238 (1972)*

65. Plaintiff asserts that the punishment meted out to her by DSS defendants is not only severe, but it is totally unnecessary. Furthermore, Plaintiff did NOT commit any crime, while Defendants' crimes are numerous and, in most cases, egregious. The ONLY evidence DSS had to support its false allegations of neglect was a fraudulently procured stipulation that never

34

even stated that EJV suffered any harm whatsoever while in Plaintiff's custody. DSS certainly could not show that EJV would be in less harm living with a habitually reckless and drunken driver!

66. Defendants' unlawful actions and failure to comply with state laws violated Plaintiff's right to due process and other civil rights and deprived her of her former good reputation and her right to custody and adoption of her grandson, the latter of which the North Carolina Court of Appeals recognized as a violation of the constitution. As a result, EJV's mother was also denied her right to any association with her only child, and EJV was put in the custody of a man with serious mental health and addiction issues, along with a string of reckless driving and DWI convictions. Plaintiff's efforts to defend herself against these egregious and unwarranted attacks on her rights and reputation also cost her the loss of her home of over 20 years in which beadboard and solid oak flooring from her great grandfather's home were installed, along with years of memories of her son and daughter's childhood.

67. Plaintiff has a constitutional property right to her reputation that was and continues to be besmirched by Defendants' criminal actions and their failure to comply with state and federal laws THEY WELL KNEW WERE REQUIRED AS PART OF THEIR DUTIES. Dare and Currituck Social Services departments have in the past and continue to pass on to doctors treating

35

Plaintiff's daughter and Courts in other N.C. counties their court-recorded derogatory and false accusations against Plaintiff hindering and preventing Plaintiff's efforts to free her daughter from continued State control and deprivation of her daughter's rights and basic, necessary privileges. In addition to her right to not have her character unjustly defamed, Plaintiff has a right to adopt her grandson, to see him and ensure that he does not remain endangered by his adoption to a man with a long criminal record and serious addiction problems. Plaintiff has a right to have expunged all derogatory comments on any record procured via violation of Plaintiff's due process rights and fraud.

68. Plaintiff believes she has also provided herein evidence to support Monell claims for damages incurred upon Currituck County (if not also Dare) for policies set by policy-makers and practiced by their subordinates that violate Constitutional due process protections.

69. Plaintiff asserts that the violations committed by Defendants designated herein are far too egregious and committed knowing full-well that they were wrong and unlawful to enjoy immunity protections from lawsuit and responsibility for damages. Providing immunity to those who commit fraud and constitutional violations so egregious that they directly cause a family to be split apart and a child kept from any contact with his biological family for many years, while placed with a parent posing serious risks of harm to him, has nothing to do with justice or the best interest of the child.

JURY DEMAND: Plaintiff demands a jury trial as to all issues so triable.

PRAYER WHEREFORE:

All derogatory statements related to Plaintiff, including the fraudulently acquired stipulation discussed herein, be expunged from all court and any other records, including lists of perpetrators of neglect.

Plaintiff prays for judgment against Defendants, as to all causes of action, as follows:

1. General damages and special damage according to proof, but in no event less than $500,000, with Defendant Matusko's damages limited to 20,000 and his deputy clerk's limited to 5,000. Suggested damages for the rest as follows:

   Romm-   $ 300,000

   Hull –    200,000

   Harriss –   200,000

   Currituck County -500,000

2. As against only the individual defendants, excluding Defendant Matusko and his Deputy Clerk and not any municipality, punitive damages as allowed by law.

   3. Attorney fees, if applicable, and pro se fees and costs.

   4. Cost of suit incurred herein.

   5. Such further relief as the Court deems just and proper.

Respectfully submitted to NC Federal District Court for the Northern District, Raleigh Office.

This the 24th day of September, 2021

Susan W. Vaughan
1417 19th Street
Greensboro, North Carolina, 27405
wellsvaughan@gmail.com
252-305-9992

37

## VERIFICATION

I, Susan W. Vaughan, Plaintiff, certify and swear, under penalty of perjury, that I have written and read the foregoing Complaint for Damages, and, to the best of my knowledge, information and belief, formed after reasonable inquiry and scrutiny of reliable evidence, that it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

This the 24th of September, 2021

*(signature)*

Susan W. Vaughan. pro se
1417 19th Street
Greensboro, North Carolina, 27405
wellsvaughan@gmail.com
252-305-9992

## CERTIFICATE OF SERVICE

I, Plaintiff, certify that on September 24, 2021, I mailed to each named Defendant copies of the Complaint herein, pages 1-38, along with all of the following: a Notice of Lawsuit and Request for Waiver of Service, a Waiver of Summons form, Completed Application to Proceed in District Court without Prepaying Fees or Costs, Disclosure of Corporate Affiliations Statement and Notice of Self-Representation. Copies were mailed via U.S. Postal Service, priority mail to all Defendants at the addresses noted below.

*(signature)*

Susan W. Vaughan

Kathlyn Springle Romm
114 Tulls Bay Dr
Moyock NC 27958

Meader W. Harriss, III
District Court Judge
PO Box 1176
Edenton, NC, 27932-1176

Raymond Matusko
Clerk of Superior Court
2801 Caratoke Highway
Currituck, NC 27929

Courtney Hull
c/o Twiford Law Firm
203 North Road Street
PO Box 99
Elizabeth City, NC 27907-0099

Currituck County Deputy Clerk
2801 Caratoke Highway
Currituck, NC 27929

38